## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DANIEL BILLINGS, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-CV-02005-RDP** |
| | } | |
| **MARK PETTWAY, in his official capacity** | } | |
| **as Sheriff of Jefferson County, Alabama,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Corrected Motion for Summary Judgment. (Doc. # 46). The motion is fully briefed (Docs. # 47, 53, 60) and is ripe for decision. For the reasons discussed below, Defendant's Motion (Doc. # 46) is due to be granted in part and denied in part.

## I.    Background [1]

This action concerns Defendant's reassignment of Plaintiffs Daniel Billings, Grady Graves, and Ronny Short from the Jefferson County Sheriff's Office ("JCSO") Birmingham Warrants Division to the Birmingham Corrections Division, more specifically the Birmingham Jail (in addition to Plaintiffs being assigned to the night shift; losing incentive pay; losing special assignments; and losing the use of their County vehicles). Billings and Graves allege that their reassignment was the result of race- and sex-based discrimination as well as retaliation, and Short claims that his reassignment was retaliation for accompanying Billings and Graves to the

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Affirmative Action Officer (AAO). All three Plaintiffs are Caucasian males and were assigned to the Warrants Division at the time of the events at issue here.

The court first discusses each Plaintiffs' employment history. Next, the court addresses the incidents that immediately preceded the Plaintiffs' reassignment (*e.g.*, Billings's and Graves's refusal to work Saturday details, Billings's and Graves's division-wide emails, and all three Plaintiffs' visits with AAO Captain Charles Buchannon). Finally, the court provides relevant information about the six individuals that Billings and Graves propose as comparators for their race- and sex-based discrimination claims.

### A. Plaintiffs' Employment History

#### 1. Daniel Billings

Daniel Billings began his work with the JCSO in October 2004. (Doc. # 56 at 14). Billings started as a Deputy Sheriff in the Corrections Division, more specifically he worked in the Jail. (*Id.*). Assignment to the Jail as a deputy is considered an entry level position, and generally deputies "roll out" of the Jail based at least partially on seniority. (*Id.*). In December 2007, Billings rolled out to Patrol and was selected to work in the Robbery Detail/Street Crimes Unit. (*Id.*). Sometime in 2010, Billings moved to the Warrants Division. (*Id.*). Billings was also selected to serve on the SWAT team, and that is where he was assigned at the time of the alleged discriminatory and retaliatory conduct. Prior to the disputed conduct, Billings had received only one disciplinary action. (*Id.* at 14-15).

#### 2. Grady Graves

In February 2006, Grady Graves started with the JCSO as a Deputy Sheriff in the Jail. (*Id.* at 14). Graves rolled out to Patrol in February 2008. (*Id.*). In September 2008, Graves transitioned to the Warrants Division. (*Id.*). Graves previously served six years on SWAT, and, at the time of

the alleged discriminatory and retaliatory reassignment, Graves had been selected to serve as a full-time member of the bomb squad. (*Id.*). Graves has never received a write-up or any other discipline. (*Id.*).

### 3.  Ronny Short

Ronny Short began his work with the JCSO as a Deputy Sheriff in the Jail in 1998. (*Id.* at 15). Short rolled out to Patrol after five years. (*Id.*). In February 2016, Short moved to the Warrants Division. (*Id.*). In May 2016, Short was promoted from Deputy to Sergeant but remained in a deputy position in Warrants. (*Id.*). While Short remained in a deputy slot, he had supervisory responsibilities as a sergeant, particularly in the field.

### B.  Events Preceding and Immediately Following the Adverse Employment Actions

The JCSO Warrants Division is responsible for executing arrest warrants and other court orders. (Doc. # 49 at 5). Chief Deputy Randy Christian instructed the Division Commanders over Warrants (Deputy Chief Cleveland Moore and Captain David Agee) to come up with a strategy to reduce the number of outstanding warrants. (*Id.*). The solution was to conduct Saturday details to apprehend subjects who would not normally be at home during the division's regularly scheduled hours. (*Id.* at 5-6). Agee told Lieutenant James Guntharp to instruct the sergeants in Warrants (Joni Money and Short) to arrange the Saturday details. (*Id.*). The Saturday details were to take place once every three months, and the sergeant was to provide deputies with at least six-weeks notice to plan their schedules accordingly. (*Id.* at 6).

While Warrants had conducted Saturday details in the past, the first Saturday detail under this new strategy -- and the first detail pertinent to the current dispute -- was the February 24, 2018 detail. (*Id.* at 8). At their request, Short excused both Billings and Graves from this February

detail.[2] (Doc. # 56 at 8). Graves's excuse was that he needed to take care of his wife after surgery, which no one disputes is a valid excuse. (Doc. # 56 at 8). And Billings's excuse was that he was going on a family vacation. (Doc. # 49 at 8; Doc. # 56 at 8). Money believed that Billings was abusing the excuse protocol and instructed Short to tell Lt. Guntharp which deputies were excused from the February detail. (*Id.* at 9).

Guntharp held a meeting with Money and Short to discuss a seven-day work week for Warrants as an alternative to quarterly Saturday details. (*Id.* at 9; Doc. # 56 at 9). This conversation was motivated, at least in part, by Billings's unwillingness to work the February detail. (Doc. # 49 at 9; Doc. # 56 at 9). The Warrant Division did not change to a seven-day work week. Rather, Warrants planned to continue with quarterly Saturday details. On March 2, 2018, Short sent an email to the Warrants Division informing everyone of the next Saturday detail on April 28, 2018. (Doc. # 49 at 9).

On March 6, 2018, a meeting occurred between Guntharp, Money, Short, and Billings. (*Id.* at 10). Exactly what was discussed is disputed by the parties. (*See id.* at 10; Doc. # 56 at 9). Defendant contends that the meeting made clear that Saturday details were mandatory unless a deputy had a "really good, valid excuse." (Doc. # 49 at 10). Plaintiffs contend that no one ever explicitly told Billings that the details were "mandatory." (Doc. # 56 at 9). For support, Plaintiffs point out that there is no clear order that labels the details as "mandatory." (*Id.*) When the facts are read in the light most favorable to Plaintiffs (the nonmoving parties here), the court must agree that no directive explicitly states that the Saturday details were "mandatory." Plaintiffs further

---

[2] Plaintiffs contend that the normal practice in the Warrants Division was that sergeants had the discretion to excuse deputies from a detail and determine what reasons constituted a valid excuse. (Doc. # 56 at 5). Short also testified that he would accept any excuse that a deputy gave him concerning the Saturday details because no matter what Agee thought, according to Short's interpretation of the JCSO policies, no one could force the deputies to work on their day off. (Doc. # 50-6 at 32-33).

4

contend that the Saturday details were subject to the practice that sergeants could excuse deputies. (*Id.* at 9). Guntharp informed Agee of the meeting, and Guntharp instructed Money to update him on Billings's participation in the April detail. (Doc. # 49 at 10).

On March 6, 2018, Sgt. Money sent a follow-up email regarding the April Saturday detail to all the deputies in Warrants as well as Guntharp and Short. (Doc. # 49 at 10). The email read in pertinent part:

> Good Afternoon All,
>
> This is your notification that our next Saturday Warrant Service will be held on Saturday, April 28, 2018 from 6AM until 1400. This is 7 weeks advance notice. I expect everyone to participate.
>
> Please respond that you have received this email and that you understand that you are expected to work this detail.

(Doc. # 54-8 at 5). Guntharp responded only to Money and asked her to provide an update on participation in the April Saturday detail. (*Id.* at 6). Guntharp also told Money that Agee was "not in the least happy about Billings" and that "it wouldn't take much to move [Billings]."

Graves replied all (except Guntharp, who was copied on the original email) to Money's email, and wrote:

> I appreciate the opportunity to work overtime, but I will not be able to attend this detail. As we discussed before the detail I am in the process of building a house and am only able to work on this house during my off days and it is critical that I get this stage completed. Once the house is in the dry my schedule will be more flexible. Thank you in advance for your understanding and patience.

(*Id.* at 7). On March 8, 2021, Billings responded to everyone on Money's email, and said:

> Yes, the county email system is up and operational. Sadly, I will be unable to volunteer for this voluntary warrant service as it falls on my regularly scheduled off day. I'm usually more flexible during the week. With that being said if you would like to revisit the idea that you denied last year of allowing deputies to report to work earlier or stay later to have more available time to serve warrants . . . . I simply ask this due to some deputies being allowed to adjust their schedules to come in early or stay late so they can work a side job on duty. I would use that time

5

toward my actual full time job. I will however be able to assist in the [] planning and logistics of the warrant service and get volunteers who are able to work.

(*Id.* at 8).

Within the hour, Guntharp forwarded Billings's email to Agee, and wrote:

Captain, we had discussed Deputy Billings unwillingness to work the special details serving warrants on the occasional Saturday. On 6 March, Sgt. Money sent out an email to all warrant detail members advising them of the planned April detail. That email is at the bottom of this one. Sgt. Money had requested a reply confirming they had gotten the email and understood. Deputy Billings has just replied and his email is below. Apparently, Deputy Billings does not wish to participate on Saturday but wants to work a schedule of his choosing. It may be time to discuss the posting of an opening for warrant detail and remove Deputy Billings.

(Doc. # 54-7 at 20). Later that day, Agee held a meeting with Money, McCreless, Short, and

Guntharp in which Agee discussed the reassignment of Billings and Graves. (Doc. # 49 at 11).

After the meeting, Agee signed a Personnel Order transferring Billings and Graves from Warrants

to Corrections. (*Id.*). On March 8, 2018, Billings and Graves received emails with Agee's

Personnel Order that reassigned them to Corrections. (Doc # 56 at 18). Also, before Agee's

Personnel Order was put on hold, emails between Guntharp and Money indicate that Guntharp

placed Billings and Graves on day shift and no weekends in the Jail. (*Id.* at 19).

On March 9, 2018, Chief Deputy Christian became aware of Agee's Personnel Order. (Doc

# 49 at 12). Christian emailed Agee asking on what authority Agee transferred the deputies. (*Id.*).

Christian's understanding was that Agee had the authority to move a deputy's shift within the Jail,

but that Agee could not move a deputy form the Warrants Division to the Corrections Division

without Christian's approval. (Doc. # 50-2 at 9-10). Within the hour, Agee explained:

Deputy Billings and Deputy Graves have refused to work Saturday details. They are only asked to work one Saturday every three months so that we can keep the outstanding warrant numbers down. They want to set their own schedule and work four 10 hour shifts. I said no because the courts are open five days a week and they need to be available. We need a full team to work these details safely. After their email response, I met with their supervisors and decided to reassign them to the jail

on dayshift. Policy and Procedure says that the Division Commander can move a person under their command to another position under his command. Please read the attached emails that they wrote to Sgt. Money after being given 7 weeks' notice of when the next detail would be.

These two deputies having been trying to persuade the other deputies not to work these details. If they are allowed to refuse an assignment then everyone else will try the same thing.

(Doc. # 50-12 at 2). Christian -- almost immediately -- responded, "Leave them where they are. Send me a request to transfer them with your reasoning. I will move them then we will post and fill their vacancies." (Doc. # 50-13 at 2).[3] Accordingly, as of March 9, 2018, Agee put the Personnel Order on hold pending Christian's review. (Doc. # 49 at 12). Billings and Graves received an order that rescinded their removal from Warrants. (Doc. # 56 at 19).

On March 11, 2018, Money sent a memorandum to Guntharp and Agee. (Doc. # 50-16). Money explained that: Billings and Graves had failed or refused to attend each of the quarterly Saturday details; Billings had stated that he will not be working any future Saturday detail; Graves had stated that he will only work a Saturday detail if the weather is not conducive to house construction; Billings frequently challenged and showed contempt the chain of command; Billings had attempted to incite contempt for the chain of command from other deputies; and Billings and Graves were assigned to special division that requires 24/7 call-out. (*Id.*). Money ended her memorandum with this: "It is unfair to the deputies who are willing to meet the requirements set forth, to continue to allow Billings and Graves to refuse their directives without consequences. It

---

[3] Plaintiffs concede that Christian made his determination solely based on the email that Agee sent on March 9, 2018. (Doc. # 53 at 11). In support, Plaintiffs cite pages 56-57, 77-78, 94-96, 121, and 123 of Christian's deposition. (*Id.*). However, pages 54-61, 74-81, and 118-121 of Christian's deposition are missing from Defendant's evidentiary submission (*See* Doc. # 50-2). Nevertheless, the court analyzes the claims as if Christian based his decision only on Agee's March 9, 2018 email.

is also detrimental to the supervision of the Warrant Division to continue to allow Deputy Billings to promote contempt for his chain of command." (*Id.*).

Agee, in turn, sent a memorandum dated March 12, 2018 to Christian and Moore. (Doc. # 50-17). Agee requested that Billings and Graves be transferred from Warrants. (*Id.*). He explained that the deputies committed a Category II Medium Offense by "[refusing] to work overtime based on a reasonable request or repeated refusals to work overtime." (*Id.*). Agee concluded his memorandum by stating, "These two deputies having been trying to persuade other deputies not to work these details. If they are allowed to refuse an assignment, everyone else will do the same." (*Id.*).

On March 12, 2018, Billings and Graves told Short that they were being discriminated against based on their race. (Doc. # 56 at 20). Short told Billings and Graves that they would need to report such a complaint to the JCSO's Affirmative Action Officer, Cpt. Buchannon. (*Id.*). Buchannon interpreted the deputies' grievance as a complaint about a work assignment rather than a complaint about racial (or sex) discrimination. (Doc. # 49 at 14). By the end of the meeting, Buchannon received the deputies' permission to speak with Chief Dep. Christian, and Buchannon spoke with Christian that afternoon. (*Id.*). However, because Short was not a complainant, Buchannon did not inform Christian that Short had accompanied the deputies to the meeting. (*Id.*). Christian explained that he had put Agee's Personnel Order on hold, and he gave Buchannon permission to speak with Agee about the deputies. (Doc. # 49 at 14; Doc. # 56 at 10).

On March 12, 2018, Agee informed Buchannon that he was reconsidering the decision to transfer the deputies. (Doc. # 56 at 12). Nevertheless, on March 13, 2018, Agee sent an email to Moore that read:

> I have reviewed the situation in warrant division as you asked and I still think that Deputies Daniel Billings and Grady Graves need to be transferred for the good of

the division. Their divisiveness continues today and will surely influence the other deputies. Rather than force them to work, it would be better to get someone who doesn't mind working an occasional Saturday.

I am also requesting that Sergeant Ronnie Short be given another assignment. On Thursday March 8, 2018 we included him in the supervisors meeting about the situation. After the meeting instead of advising the deputies that their attitude and conduct was wrong, he partnered up with the deputies to believe that they had the right to refuse an assignment. Sgt. Short has not made a good transition from deputy to supervisor due to his friendship with his coworkers.

(Doc. # 50-19 at 1). Moore forwarded Agee's email to Christian and added "I concur … that leaving [Billings and Graves in the Warrants Division] would not serve … the best interest of the Sheriff's Office. I also concur [with] the request that Sergeant Ronnie Short be transferred for conduct unbecoming of a supervisor." (*Id.*). Christian responded that he would handle the situation. (*Id.*).

On March 13, 2018, Christian issued Personnel Orders reassigning Billings and Graves to Corrections. (Docs. # 50-20, 50-21). Christian also removed the deputies from their special assignments in SWAT and the bomb squad. (Doc. # 56 at 15). Christian did not view the orders as disciplinary. (*Id.* at 15-16). Instead, he said the reassignment and removal of special assignments was "a management issue" because the deputies refused to work details outside of their normal shift with several weeks' notice. (*Id.*).

That same day, Christian issued a Personnel Order reassigning Short from Warrants to Corrections. (Doc. # 50-22). Christian stated that he did not consider Short's reassignment a disciplinary issue and that Agee's and Moore's recommendation did not influence his decision to transfer Short. (Doc. # 49 at 17). Instead, Christian viewed Short's reassignment to the Jail as a management issue — moving a sergeant from a deputy slot in Warrants to a sergeant position in Corrections. (*Id.*). Additionally, Christian confirmed that Buchannon did not mention that Short accompanied the deputies to the AAO. (*Id.*).

9

Billings, Graves, and Short returned to the AAO on March 14, 2018. (Doc. # 56 at 22). Plaintiffs discussed Christian's Personnel Orders that reassigned each of them to Corrections and stripped the deputies of their special details (SWAT and bomb squad). (*Id.*). Buchannon told the three that it "sounded like [they] pissed somebody off." (*Id.*). Buchannon then instructed Short to leave the room, and he told the deputies that Short did not do them any favors by bringing them to the AAO. (*Id.* at 23). Additionally, Short alleges that when he reported to the Jail the following conversation occurred between him and Agee:

> Captain Agee asked me - he goes, what did you do wrong? And I said, excuse me, sir? He goes, what did you do wrong? I said, I didn't do anything wrong. He goes, well, you need to think long and hard about what you did. I said, if you're referring to me sitting in with two deputies as I'm required to by policy to report, you know, discrimination or hostile work environment whether I believe it or not, then that must be what I did. He goes, that's it. You shouldn't have sat in with them.

(*Id.* at 4).

### C. Plaintiffs' Comparator Evidence

Plaintiffs Billings and Graves propose six comparators for their claims of race- and sex-based discrimination: Ashley Mann, Lawanda Bonner, Ashley Buxton, Dominisha Lucas, Walter Love, and Kenny Fells. (Doc. # 14 at 9, 11).

Mann is a Caucasian female who worked with the JCSO as a Patrol deputy. (Doc. # 49 at 17). Mann refused to work a mandatory overtime, but it is unclear from the parties' briefs whether she was disciplined.[4] Also, neither party details Agee's (or Christian's) role -- or lack thereof -- in Mann's discipline. (*See* Doc. # 49 at 17-18; Doc. # 56 at 23, 33).

---

[4] Plaintiffs do not dispute paragraph 80 of Defendant's brief that states, "Mann … was reprimanded for an incident refusing to work a mandatory shift during a state of emergency." (Doc. # 49 at 17; *see* Doc. # 56). But Plaintiffs contend in paragraph 72 of their brief that "[Mann] was not disciplined." (Doc. # 56 at 23). In reply, Defendant generally denies paragraphs 70-108 (the comparator section) of Plaintiff's response brief. (Doc. # 62 at 15).

Bonner is an African American female who worked in the Jail. (Doc. # 49 at 18). She reported to Guntharp, who in turn reported to Agee. (Doc. # 56 at 23). Bonner committed several violations of the JCSO policies, including failing to report at the time and place specified by her assignment, failing to give notice that she was unable to report for duty, being absent without proper leave or permission, and incompetence. (*Id.* at 25). On multiple occasions, Bonner abruptly ended a telephone conversation with Guntharp and refused to come to work. (*Id.* at 24). While Guntharp recommended that Bonner receive a five-day suspension without pay, Agee issued her a written reprimand. (*Id.* at 25).

Buxton is a Caucasian female who worked in Corrections, and she abandoned/refused to work her assignment at the hospital. (*Id.* at 26). In a meeting with Guntharp and Agee about these purported violations, Buxton became "loud, rude, demanding [, and] insubordinate." (*Id.*). Agee determined that Buxton violated four JCSO policies: insubordination, absence without proper leave, advanced notice of time off, and impairing the efficiency or reputation of the Sheriff's Office. (*Id.*). Agee issued her a written reprimand. (*Id.*).

Lucas is an African American female who worked in Corrections. (Doc. # 56 at 26). She refused to work an assigned shift by no call/no show and received no discipline other than a verbal discussion. (Doc. # 49 at 19). While under Agee's chain of command, Lucas was involved in an altercation while working an unauthorized part-time job. (*Id.*). Guntharp recommended that Lucas should be prohibited from working a secondary job "in light of [her] lengthy list of violations." (*Id.* at 27-28). Agee issued Lucas a one-day suspension. (*Id.* at 28).

Love is an African American male who worked in Corrections. (*Id.*). On one occasion, Love refused to do paperwork in an assigned job, cursed at two superiors, and left his post. (*Id.*). Guntharp counseled Love on this incident and recommended that Agee remove Love from a

special assignment, but there is no record of Agee's action. (*Id.*). On another occasion, Love fell

asleep while supervising an inmate at UAB hospital. (*Id.*). A sergeant recommended to Agee that

Love receive a five-day suspension based on Love also having two prior write-ups in his record.

(*Id.* at 28-29). Agee issued Love a one-day suspension. (*Id.* at 29).

Fell is an African American male that worked in Corrections. (*Id.*). Fell claimed to have

clocked into work at the Jail, but he was actually at a protest at the Water Works Board. (Doc. #

49 at 19). Fell received a five-day suspension without pay for the incident. (*Id.*).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking

for summary judgment always bears the initial responsibility of informing the court of the basis

for its motion and identifying those portions of the pleadings or filings which it believes

demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has

met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by

pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file --

designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

*Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d

1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-

52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

The Eleventh Circuit has interpreted *Celotex* to require that, as to issues on which the nonmovant would bear the burden of proof at trial, a

> moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Fitzpatrick*, 2 F.3d at 1115 (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)). And, where the moving party has met this initial burden by showing that there is an absence of evidence supporting the nonmoving party's case, the nonmoving party must

> respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Id.* (internal citations omitted).

## III.    Analysis

Plaintiffs' Second Amended Complaint contains three counts. (*See* Doc. # 14). In Count I, Plaintiffs Billings and Graves allege claims of race discrimination and retaliation in violation of Title VII. (*Id.* at 16-18). In Count II, Plaintiffs Billings and Graves allege claims of sex discrimination and retaliation in violation of Title VII. (*Id.* at 18-20).[5] In Count III, Plaintiff Short

---

[5] The court notes that Plaintiffs' Second Amended Complaint is the third type of shotgun pleading described in *Weiland v. Palm Beach County Sheriff's Office*: "not separating into a different count each cause of action of claim for relief." 792 F.3d 1313, 1322-23.

alleges a claim of retaliation in violation of Title VII. (*Id.* at 20-22). After careful review, the court concludes that Defendant is entitled to summary judgment on the portion of Billings's and Graves's claims that concern race discrimination and sex discrimination. However, there is a genuine issue regarding each Plaintiffs' claim of retaliation that must be left for the trier of fact. The court addresses Plaintiffs' retaliation claims and then turns to Billings's and Graves's discrimination claims.

### A. Retaliation Claims

Title VII's anti-retaliation provision reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The first subsection is known as the "participation" clause, and the second subsection is known as the "opposition" clause. "[T]he protection afforded by [Title VII] is not limited to individuals who have filed formal complaints[ ] but extends as well to those ... who informally voice complaints to their superiors" under the opposition clause. *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 753 (11th Cir. 2017) (citing *Rollins v. State of Fla. Dep't. of Law Enforcement.*, 868 F.2d 397, 400 (11th Cir. 1989)).

In the absence of direct evidence,[6] a claim of retaliation generally follows the *McDonnell Douglas* framework. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). "However,

---

[6] The Eleventh Circuit "define[s] direct evidence as 'evidence, which if believed, proves existence of fact in issue without inference or presumption.'" *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987)). However, "[e]vidence that only suggests [retaliation] or that is subject to more than one interpretation, does not constitute direct evidence." *Id.* (internal citations omitted). "[T]he quintessential example of direct evidence would be a management memorandum saying, 'Fire Earley—he is too old.'" *Id.* at 1190 (quoting *Earley v. Champion Intern. Corp.*, 907 F.3d 1077, 1081 (11th Cir. 1990)). The statements that Plaintiffs contend are direct evidence, which are detailed more fully below, are not direct evidence because a reasonable juror would have to make an inference before finding retaliation. First, none of the statements were made by the ultimate decisionmaker, so the trier of fact would have to infer that the statement was based on a

establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer [retaliated] against the plaintiff, summary judgment is improper." *Id.* In other words, "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional [retaliation] by the decisionmaker.'" *Id.*

While the Eleventh Circuit has not "considered in a precedential opinion whether a plaintiff can sustain her burden to establish a circumstantial case of retaliation by relying on the 'convincing mosaic,'" *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n. 1 (11th Cir. 2021), this court cannot conceive of a reason that would limit a retaliation-plaintiff to the *McDonnell Douglas* framework. *See James v. City of Montgomery*, 823 F. App'x 728, 735 (11th Cir. 2020) (assuming for the sake of argument that the mosaic theory applied to a retaliation claim). In fact, the Eleventh Circuit has vacated a district court's grant of summary judgment because: "[the retaliation-plaintiff] established 'a convincing mosaic of circumstantial evidence' that would permit a jury to infer that [the defendant] retaliated against him because of his [protected activity]." *Calvert v. Doe*, 648 F. App'x 925, 928-30 (11th Cir. 2016).

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated

---

conversation with the decisionmaker. Second, the statements are subject to more than one interpretation. Third, none of the statements are as explicit as "Fire Earley—he is too old." Nonetheless, each of the statements constitutes circumstantial evidence of retaliation.

employees, and (3) that the employer's justification is pretextual. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019). In *Lockheed-Martin*, although the evidence did not fit neatly into the *McDonnell Douglas* framework, the "convincing mosaic" of circumstantial evidence presented by the plaintiffs was overwhelming and included: a documented history of disparate treatment of Caucasian and African-American employees; a spreadsheet listing employees under investigation by name and race that the defendant's disciplinary review committee used to make disciplinary decisions; and a news program reporting the defendant's struggles with racism in the workplace, which focused on violence by a white supremacist. *See* 664 F.3d at 1329-40.

### 1. Deputies Billings and Graves

Billings and Graves present the following Rule 56 evidence in support of their retaliation claim. First, Billings and Graves contend they participated in protected activity on March 12, 2018, when they visited Buchannon, the AAO, and complained about race discrimination. (Doc. # 56 at 20). Second, Buchannon informed Christian of the deputies' visit. (Doc. # 49 at 14). Third, Christian issued the Personnel Orders that reassigned the deputies on March 13, 2018. (Docs. # 50-20, 50-21). Fourth, on March 14, 2021, during their second visit to the AAO, Buchannon told the deputies that "it sounded like [they] pissed somebody off." (Doc. # 56 at 22). And, after becoming frustrated with Short and telling him to leave the room, Buchannon told the deputies that "Sgt. Short hadn't done [them] any favors by bringing [them] over here." (*Id.*).

Defendant argues that Billings and Graves were reassigned and stripped of their special assignments for non-retaliatory reasons: their unwillingness to work the Saturday details and their division-wide email responses to Money's notice of the April detail. (Doc. # 47 at 25). Defendants also assert that Christian contemplated the adverse employment actions against Billings and

Graves as early as March 9, 2018 -- *i.e.*, three days before the deputies participated in protected activity.[7] (*Id.*).

However, when the evidence is viewed in the light most favorable to Plaintiffs, a reasonable juror could conclude that Christian, the ultimate decisionmaker, retaliated against Plaintiffs. Christian had knowledge of the deputies' protected activity on March 12, and he issued the adverse employment actions on March 13. The one-day difference constitutes close temporal proximity. Additionally, a reasonable juror could infer that Buchannon's March 14 statements, particularly that they had "pissed somebody off" and that Short did not do the deputies any favors by bringing them to the AAO, was based on a conversation he had with Christian. These pieces of circumstantial evidence (the close temporal proximity between the protected activity and the adverse employment action in addition to Buchannon's alleged statements) "raise a reasonable inference that the employer [retaliated] against" Billings and Graves. *See Lockheed-Martin Corp*, 644 F.3d at 1328. Accordingly, summary judgment on their retaliation claims is improper.

### 2.  Sergeant Short

The following Rule 56 evidence supports Short's retaliation claim: First, Short's transfer from Warrants to Corrections was an adverse employment action because it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Second, Short participated in protected activity on March

---

[7] The Eleventh Circuit's interpretation of *McDonnell Douglas* would allow Plaintiffs Billings and Graves to overcome the fact that Christian contemplated the adverse action prior to the protected activity by offering additional evidence of retaliation (*i.e.*, Buchannon's March 14 statements). *See EEOC v. NDI Office Furniture LLC*, No. 2:18-cv-01592-RDP, 2021 WL 2635356 at *12 (N.D. Ala. June 25, 2021) (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). However, under *Chapman v. AI Transport*'s interpretation of *McDonnell Douglas*, Plaintiffs' claims argument would fail despite the circumstantial evidence of retaliation because Billings and Graves fail to meet head-on Defendant's assertion that the adverse action was triggered by the deputies' division-wide emails. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

12, 2018 by supporting the deputies' visit to the AAO. (Doc. # 56 at 20). Third, on March 12, 2018, Buchannon spoke with Christian about the deputies' meeting with the AAO.[8] (Doc. # 49 at 14). Fourth, Christian issued the Personnel Order transferring Short on March 13, 2018. (Doc. # 50-22). Fifth, Short contends that when he reported to the Jail, he had the following conversation with Agee:

> Captain Agee asked me - he goes, what did you do wrong? And I said, excuse me, sir? He goes, what did you do wrong? I said, I didn't do anything wrong. He goes, well, you need to think long and hard about what you did. I said, if you're referring to me sitting in with two deputies as I'm required to by policy to report, you know, discrimination or hostile work environment whether I believe it or not, then that must be what I did. He goes, that's it. You shouldn't have sat in with them.

(Doc. # 56 at 4).

Defendant contends that the reason for reassigning Short was that he had "fallen through the cracks" since being promoted to the rank of sergeant. That is, Short was promoted to sergeant in May 2016, but he remained in a deputy slot in the Warrants Division for some two years — until the events that underlie this lawsuit. But, it will be for a jury to assess that assertion.

When all this evidence is viewed in the light most favorable to Plaintiff Short, a reasonable juror could find that Christian, the ultimate decisionmaker, retaliated against Short for assisting the deputies in their visit to the AAO. That is, a reasonable juror could conclude that Christian had knowledge of Short's support for the deputies' protected activity, particularly considering Agee and Short's conversation. Again, the one-day difference between the protected activity and the adverse employment action constitutes close temporal proximity. Additionally, a reasonable juror could infer that Agee and Short's conversation was based on information Agee received from Christian. This mosaic of circumstantial evidence (the close temporal proximity between the

---

[8] To be clear, Buchannon and Christian state that Short's name was not mentioned in their conversation. Nevertheless, as there is circumstantial evidence that tends to call that testimony into question, it will be for a jury to decide whether to credit those assertions. (Doc. # 49 at 14).

protected activity, the adverse employment action, and Agee's alleged statements) "raise[s] a reasonable inference that the employer [retaliated] against" Short. *See Lockheed-Martin Corp.*, 644 F.3d at 1328. Accordingly, summary judgment on Short's retaliation claims is improper.

### B. Billings's and Graves's Race- and Sex-Based Discrimination Claims [9]

Title VII claims have been categorized into single-motive and mixed-motive claims. *Quigg v. Thomas Cnty. School Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). "Mixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action." *Id.* at 1235 n.4. The principal difference between the two theories is the causation standard that a Title VII plaintiff must meet to prove discrimination. *Id.* Under a mixed-motive theory, a plaintiff can succeed by showing "that illegal bias … was a motivating factor for [the] adverse employment action even though other factors also motivated the action." *Id.* (internal quotations omitted). However, under a single-motive claim, the plaintiff must show "that illegal bias was the true reason for the adverse action." *Id.* at 1235.

#### 1. Single-Motive Theory

Plaintiffs do not allege direct evidence of race- or sex-based discrimination. (Doc. # 56 at 31-34). Rather, Plaintiffs rely on circumstantial evidence to establish discrimination. (*Id.*). Historically, Title VII discrimination claims that rely on circumstantial evidence have been evaluated under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012) ("A plaintiff typically makes a case of discrimination through indirect evidence using the burden-shifting framework set out in *McDonnell Douglas* …."). Of course, there are other methods which may be used in a Title VII case to show that a genuine issue of a

---

[9] Because the same adverse employment actions are at issue in both the race and sex discrimination claims, and the same analysis under Title VII applies, the court considers the claims together.

material fact exists on summary judgment. Therefore, the court begins its analysis of Plaintiffs Billings's and Graves's Title VII discrimination claim under the well-established *McDonnell Douglas* framework. It will then address Plaintiffs' "mosaic theory" arguments.

### a. *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). Once a plaintiff has presented a *prima facie* case and established a presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). The employer's burden involves no credibility determination, *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *Brown v. Ala. Dep't Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) ("The employer 'need not persuade the court that it was actually motivated by the proffered reasons.'" (quoting *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981))).

If the employer satisfies that burden by articulating one or more such nondiscriminatory reasons for the challenged decision, the presumption of discrimination is dispersed, and the burden again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Perryman*, 698 F.2d at 1142. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it "head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). "If the plaintiff does not proffer sufficient evidence to create

a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1024-25.

### (1) Plaintiffs' *McDonnell Douglas Prima Facie* Evidence

Under the familiar *McDonnell Douglas* test, a Title VII plaintiff claiming that he suffered a discriminatory employment action generally must show the following to establish a *prima facie* case: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; [10] and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Here, Defendant only contests whether Plaintiff can establish the fourth prong of the *prima facie* test. Plaintiff presents no evidence regarding who replaced them after their reassignment to Corrections. Therefore, Plaintiffs' *prima facie* case rests on whether they have presented appropriate comparator evidence. See *Maynard*, 342 F.3d at 1289. And, "[a] plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a *prima facie* case." *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (citing *Lewis*, 918 F.3d at 1224).

---

[10] Plaintiffs Billings and Graves allege that the adverse actions taken against them consisted of:

being stripped of their assignments to the Warrants Division; being reassigned to the County Jail on the night shift from 10:00 p.m. to 6:00 a.m … ; losing incentive pay; losing potential retirement benefits; losing the use of their County vehicles; losing the ability to perform side jobs in association with same; losing the ability to serve in their specialist assignments such as SWAT, Bomb Squad, etc.; losing their abilities to be promoted within the JCSO; losing career momentum for future advancement; and losing their reputation within JCSO.

(Doc. # 14 at 16).

An employee identified as a comparator by a Title VII plaintiff must be "similarly situated in all material respects."[11] *Lewis*, 918 F.3d at 1226. The Eleventh Circuit has clarified the types of similarities that indicate a valid comparison. *Id.* at 1127. In general, a plaintiff must establish that the comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

Comparator evidence does not turn not on formal labels, "but rather on substantive likenesses. . . . [A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)). The standard balances an employee's right to be free from discriminatory actions and an employer's legitimate interest and discretion in hiring, promoting, and discharging employees. *Lewis*, 918 F.3d at 1225. In fact, the purpose of the *Lewis* factors is to determine "whether the material 'likenesses' between the plaintiff and the proffered comparator in a particular case 'eliminat[e] the most common nondiscriminatory reasons' for an employer's differential treatment of the two employees and justify 'an inference of unlawful discrimination' by the employer.'" *Moreland-Richardson v. City of Snellville, Georgia*, No. 19-14228, 2021 WL 4452523, at *6 (11th Cir. Sept. 29, 2021).

---

[11] The court notes that Defendant's mistakenly argue the outdated "nearly identical" standard for proposed comparators. (Doc. # 49 at 23-24). The Eleventh Circuit explicitly rejected this standard and implemented the current "similarly situated in all materials respects" standard. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019) (en banc). Accordingly, after a careful review of the Rule 56 record and the relevant portions of Defendant's briefing, the court analyzes the proposed comparators under the appropriate "similarly situated in all material respects" test. Also, Defendant's mistake as to the standard for analyzing comparators does not affect the second portion of the *McDonnell* Douglas framework: Defendant's nondiscriminatory reasons for reassigning Billings and Graves.

"[T]he plaintiff and [his] comparators need *not* be 'similar in all but the protected ways.'" *Lewis*, 918 F.3d at 1227 (quoting *Young*, 135 S. Ct. at 1354). Indeed, "[w]hether a comparator is similar in 'all material respects' is determined on a case-by-case basis, considering the individual circumstances in each case." *Lewis*, 918 F.3d at 1224.

The Eleventh Circuit's post-*Lewis* cases shed light on how a proposed comparator might be reasonably identified. For example, in *Smith v. Vestavia Hills Board of Education*, 791 F. App'x 127 (11th Cir. 2019), the plaintiff was the secretary at Vestavia Hills High School. *Smith* 791 F. App'x at 128. It was imperative that her station was continuously covered during working hours. *Id.* If the plaintiff had to step away from her desk, then another office employee needed to cover for her. *Id.* However, in *Smith*, the plaintiff was habitually late, and, as a result, the school board did not renew her employment. *Id.* at 129. The Eleventh Circuit reasoned that desk coverage was a critical component of plaintiff's job. *Id.* at 131. And, the court held that the plaintiff failed to provide a comparator similarly situated in all material respects because none of the provided comparators' job functions required continual desk coverage. *Id.*

A difference in employment history can also distinguish a purported comparator. *Earle v. Birmingham Board of Education*, 843 F. App'x 164 (11th Cir. 2021). In *Earle*, two plaintiffs brought a claim of discrimination in pay under Title VII against the Birmingham Board of Education. The plaintiffs alleged that the fact that an individual of a different race in their same position was paid more was *prima facie* evidence of discrimination. The Eleventh Circuit disagreed. Part of the court's rationale was that the comparator did not have the same employment history as the plaintiffs. *Earle*, 843 F. App'x at 167 ("While [plaintiffs] both spent their entire tenure with the Board as Security Officers, [comparator] was transferred multiple times and spent four years serving as an Attendance Officer — a higher paid position.").

24

Different types or incidents of misconduct may also rule out potential comparators. A difference in day-to-day job duties may also indicate that a comparator is not "similarly situated in all material respects." *Vinson v. Tedders*, 844 F. App'x 211, 213-14 (11th Cir. 2021). In *Vinson*, the plaintiff was an accountant clerk. *Id.* at 212. Her job included processing deposits, keying general ledgers, and typing refund checks. *Id.* The plaintiff alleged that she was being discriminated in pay based on her race in violation of Title VII. The alleged comparator was a staff accountant who performed the same general duties as the plaintiff in addition to processing Title Ad Valorem Tax adjustments and assisting with electronic title registration receipts. *Id.* at 213-14. The Eleventh Circuit concluded although a difference in job title is not dispositive, the difference in day-to-day job duties confirmed that the proposed comparator was not similarly situated in all material respects. *Id. See also Lewis*, 918 F.3d at 1227 (reasoning that *minor* differences in job function will not disqualify a would-be comparator).

A proffered comparator's misconduct must be "sufficiently *similar* to [the plaintiff] so that the different disciplinary actions they received would give rise to an inference of discrimination." *Blash v. City of Hawkinsville*, 856 F. App'x 259, 265 (11th Cir. 2021); *Ward v. Troup County School District*, 856 F. App'x 225 (11th Cir.  2021) (reasoning, in part, that the six proffered comparators were distinguishable because they had not sent a faculty-wide, unprofessional email). The inquiry is not whether the comparator committed a more serious offense. *Blash*, 856 F. App'x at 265. In fact, a plaintiff's insistence that the comparator's misconduct was worse "merely highlights the fact that [the] conduct was different." *Id.*

In this case, the key facts regarding the four *Lewis* factors are as follows: First, the basic conduct Billings and Graves engaged in was two-fold. Billings and Graves refused to work a special detail outside of their regularly scheduled hours, regardless of whether Sgt. Money (or

anyone above her in the chain of command) had the authority under the JCSO's Rules and Regulations to order Plaintiffs to participate in the Saturday detail. Also, Billings and Graves sent division-wide emails "explaining" their rationales for not attending the April detail.

Second, each deputy in Warrants and Corrections is subject to the JCSO Rules and Regulations. (Doc. # 53 at 15). But, being subject to the same employment policy alone does not mean a comparator is similarly situated in all material respects. *Stimson v. Stryker Sales Corp.*, 835 F. App'x 993, 997 (11th 2020) (reasoning that plaintiff and comparator were subject to the same work policy but plaintiff's misconduct, supervisor, employment history, and disciplinary history were materially distinguishable from the proposed comparator).

Third, in March 2018, the chain of command in Warrants was this: Sgt. Money and Sgt. Short reported to Lt. Guntharp, who reported to Capt. Agee, who reported to Chief Moore, who reported to Chief Deputy Christian, who in turn reported to Sheriff Hale. (Doc. # 53 at 15). In March 2018, the chain of command in Corrections was this: sergeants reported to Lt. Guntharp and Lt. Brian Reeves, who reported to Cpt. Agee, who reported to Chief Moore, who reported to Chief Deputy Christian, who in turn reported to Sheriff Hale. (Doc. # 50-5 at 8-9).

Fourth, Billings and Graves began their careers with the JCSO in the Jail, rolled out to Patrol, and then transitioned to the Warrants Division. Additionally, a deputy's responsibilities in Corrections are different from a deputy's responsibilities in Warrants. The role of Warrants is to execute arrest warrants and other orders from a court in addition to transporting and extraditing prisoners. (Doc. # 50-1 at 2). The role of Corrections is to operate the Birmingham Jail, which includes overseeing the custody, security, and care of all sentenced and pre-sentenced prisoners held in the facility. (*Id.*).

Here, Plaintiffs point to six individuals that they contend are comparators: Lawanda Bonner, Ashley Buxton, Dominisha Lucas, Walter Love, Kenny Fells, and Ashley Mann. (Doc. # 14 at 9, 11). Five of the comparators work in Corrections, and the sixth is a Patrol deputy. None of the comparators are deputies in Warrants.

"Treating *different* cases differently is not discriminatory." *Lewis*, 918 F.3d at 1222-23 (emphasis in original). In this case, the purported comparators are each different -- and, thus, distinguishable -- for several reasons. To begin, none of the comparators have a similar employment history to Plaintiffs. The comparators in Corrections -- Bonner, Buxton, Lucas, Love, and Fells -- never "rolled out" of the jail.[12] And while Plaintiffs have not provided background, at best, Mann rolled out from the Jail to Patrol but never transitioned to Warrants. Again, none of the proposed comparators worked in the Warrants Division.

Second, the proposed comparators have different day-to-day responsibilities than Plaintiffs. As described above, the duties of a deputy in Warrants are to execute arrest warrants and other court orders while the duties of a deputy in Corrections include overseeing the daily operations of the Birmingham Jail. These responsibilities inherently entail different day-to-day tasks. Specifically, it is critical that deputies in Warrants are available to fulfill their duty of serving warrants.

Third, none of the comparator's misconduct is materially similar to that of Plaintiffs. Plaintiffs argue that the comparators' misconduct was similar to -- or at least worse than -- Plaintiffs' misconduct. As illustrated by the court in *Ward*, the inquiry is whether the conduct is

---

[12] One of the alleged adverse actions against Billings and Graves was their reassignment from Warrants back to the Jail in Corrections. Obviously, a JCSO employee that is already assigned to Corrections could never receive the punishment of being reassigned to Corrections. Accordingly, the five comparators already assigned to Corrections are materially distinguishable from Billings and Graves for that reason.

sufficiently similar. But here, none of the comparators refused to work *multiple* overtime details with several-weeks notice. Further, none of the comparators sent a division-wide email "explaining" their rationale for non-attendance (and in Billings's case that the county email system was operational).[13]

Finally, in regard to the loss of special assignments, the evidence shows that this aspect of the discipline was solely Christian's decision.[14] Plaintiffs do not present a single comparator that was disciplined by Christian. In fact, the comparator section of Plaintiffs' brief is labeled "Capt. Agee's Disparate Treatment of Comparators." (Doc. # 56 at 23). Therefore, in addition to the other reasons above that distinguish the comparators from Plaintiffs, in this aspect of their legal challenges, they also do not have the same decisionmaker.

The court concludes that Plaintiffs Billings and Graves have failed to establish a *prima facie* case of discrimination. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' race- and sex-based discrimination claims under *McDonnell Douglas* for this reason alone.

### (2) Defendant's Nondiscriminatory Reasons

Even if Plaintiffs had presented appropriate comparator evidence (and to be clear, they did not), the court would then proceed to evaluate Defendant's reason for their discipline. Here, Defendant has articulated a nondiscriminatory reason for transferring Billings and Graves to

---

[13] Clearly, one email is less professional than the other. But, as the court discusses below, further analysis is not needed because Plaintiffs fail to meet head-on Defendant's reason for discipline in response to the emails and do not rebut them as legitimate, non-discriminatory reasons for their reassignment or other adverse actions.

[14] The court notes that Plaintiffs have not articulated a "cat's paw" theory of liability between Agee and Christian. A "'cat's paw' theory of liability, also referred to as 'subordinate bias theory,' seeks to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Sims v. MVM, Inc.* 704 F.3d 1327, 1335 n. 6 (11th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). Regardless of whether Plaintiffs' theory is that Christian was the ultimate decisionmaker but Agee was biased, the other circumstances still distinguish the comparators so that they are not similarly situated in all material aspects.

Corrections and removing them from their special assignments. When a plaintiff makes out a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 253). The burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.*

"Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. [The court is] not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" *Flowers v. Troup Cty, Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).

Defendant articulates, in effect, two legitimate, non-discriminatory reasons for transferring Billings and Graves to Corrections, each involving a violation of a work rule. (Doc. # 47 at 25). Defendant asserts that Billings and Graves violated a work rule when they "failed to report for Saturday Details" and when they "sent department wide emails openly refusing to attend the Saturday Detail scheduled for April 28, 2018 following Sgt. Money's direct order with seven weeks' notice that these Saturday Details were part of their duties and assignments in Warrants." (*Id.*). To be sure, Defendant could have specified which work rule (or rules) that Plaintiffs violated. Nonetheless, the court understands that Defendant contends it transferred Plaintiffs for (1) failing to commit to Saturday Details and (2) sending unprofessional department-wide emails. This satisfies Defendant's "exceedingly light burden" to proffer a legitimate, nondiscriminatory reason for the adverse actions taken against Plaintiffs.

### (3) Plaintiff's *McDonnell Douglas* Pretext Arguments

Because Defendant has met his burden of production, the burden shifts back to Plaintiffs to show that Defendant's proffered reasons are a pretext for unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). Even if a plaintiff has established a *prima facie* case, any inference of discrimination raised by that showing is dispersed. So, at this stage of the *McDonnell Douglas* framework, a plaintiff "must come forward with evidence that would be sufficient to convince a reasonable fact-finder that the reason given by the employer is pretextual." *Forsyth v. University of Alabama Board of Trustees*, No. 7:17-cv-00854-RDP, 2020 WL 3129864 at *15 (N.D. Ala. June 12, 2020) (quoting *Dale v. Wynne*, 497 F. Supp. 2d 1337, 1343 (M.D. Ala. 2007)) (and in turn quoting *Wascura v. South Miami*, 257 F.3d 1220, 1242 (11th Cir. 1999)). "Evidence introduced to establish the prima facie case may [also] be considered to establish pretext." *Menefee v. Sanders Lead Co.*, 786 F. App'x 963, 967 (11th Cir. Sept. 18, 2019) (citing *Hairston v. Gainesville Sub Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993)). But, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, *and* that discrimination was the real reason.'" *Husk v. City of Talladega, Ala.*, 2019 WL 2578075, at *4 (N.D. Ala. June 24, 2019) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis added).[15] And again, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024-25 (emphasis added).

---

[15] Every employer in a Title VII action is quick to remind the court that "Title VII is not a shield against harsh treatment at the workplace.... The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Comms.*, 738 F.2d 1181, 1187 (11th Cir. 1984) *abrogated on other grounds by Lewis v. City of Union City, Ga.*, 918 F.3d 1213 (11th Cir. 2019)).

Here, simply stated, Plaintiffs have neither rebutted nor met head-on Defendant's reasons for transferring Plaintiffs. Defendant offered a two-fold rational for that action: (1) Plaintiffs failed and/or refused to commit to Saturday details and (2) Plaintiffs sent department-wide emails openly refusing to participate in the April detail. But here, Plaintiffs have only addressed the former reason. Under *Chapman*, Plaintiffs' failure to rebut their sending of the emails as a legitimate, nondiscriminatory reason for their transfer necessitates the court's conclusion that Plaintiffs have not met their burden at the Rule 56 stage under the *McDonnell Douglas* framework. (Note: As discussed above, the court denied summary judgment on Plaintiffs' retaliation claims. To be clear, although under *Chapman* this omission is fatal to Plaintiffs' claims of discrimination under the *McDonnell Douglas* framework, it does not operate to dismantle the inference raised by the convincing mosaic that Plaintiffs set forth related to their retaliation claim).

In conclusion, Plaintiffs Billings and Graves have failed to presented a *prima facie* case of discrimination. Alternatively, they have failed to meet head on each of Defendant's legitimate, nondiscriminatory reasons for taking the adverse actions at issue in order to show those reasons were a pretext. Accordingly, under the *McDonnell Douglas* framework, Defendant's motion for summary judgment is due to be granted on the claims of race- and sex-based discrimination.

#### b.  Other Circumstantial Evidence of Discrimination

The *McDonnell Douglas* framework "is not the exclusive means" by which a plaintiff can prevail on a Title VII claim based on circumstantial evidence, *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n. 3 (11th Cir. 2005). However, in this case, Plaintiffs' claims of discrimination are based solely on proposed-comparator evidence and the purported lack of a work rule violation.[16] This type of evidence fits neatly within the *McDonnell Douglas* framework, as

---

[16] The court notes that the mosaic theory allows a court to consider comparator evidence that does not fit within *Lewis*'s definition of "similarly situated in all material respects" (*i.e.* misconduct that is worse than the

opposed to Plaintiffs' claims of retaliation detailed above. Nevertheless, after careful review of the Rule 56 record, the court concludes that the Rule 56 record does not contain a mosaic of evidence from which a reasonable juror could infer race- or sex-based discrimination.

### C. Mixed-Motive Theory for Discrimination (and Retaliation)

As explained above, a mixed-motive claim is a distinct theory of discrimination. A mixed-motive theory must be properly pleaded and argued at each stage of the litigation. *Smith v. Vestavia Hills Board of Education*, 791 F. App'x 127, 130 (11th Cir. 2019). In other words, "a plaintiff cannot make only a 'passing reference to a mixed-motive theory' to sufficiently raise the issue." *Id.* (citing *Keaton v. Cobb Cty.*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)).

Here, Plaintiffs have failed to develop a mixed-motive theory argument both in their complaint and in their summary judgment briefing. (*See* Docs. # 14, 56). The entirety of Plaintiffs' mixed-motive argument is this:

> Additionally, in some discrimination cases, plaintiffs can survive a motion for summary judgment under a mixed-motive framework, wherein, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision. *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)). This framework does not call for the unnecessary burden-shifting required by *McDonnell Douglas*, nor does it suffer from *McDonnell Douglas's* pitfall of demanding that employees prove pretext. *Id.* at 1240. Plaintiffs aver this is such a case; sufficient Rule 56 evidence exists for a reasonable jury to conclude that Plaintiffs' race and/or gender was a motivating factor in Defendant's decision to issue a disciplinary transfer to the Jail.

(Doc. # 56 at 39) (internal quotations omitted). Plaintiffs have not directed the court to any Rule 56 evidence that would satisfy their burden under *Celotex*. Rather, Plaintiffs "make only a passing reference to a mixed-motive theory." Plaintiffs have failed to properly present at the Rule 56 phase

---

plaintiff's). *See Mercer v. Alabama Dep't of Transportation*, No. 2:16-CV-01204-RDP, 2018 WL 4489504 at *11 (N.D. Ala. Sept. 18, 2018).

a viable Title VII discrimination or retaliation claim under the mixed-motive theory. And, even more importantly, the Rule 56 record does not contain substantial evidence to support a mixed-motive claim. Accordingly, the court does not analyze any of Plaintiffs' claims under a mixed-motive theory.

**IV.     Conclusion**

Defendant's Motion for Summary Judgment (Doc. # 46) is due to be granted in part and denied in part.

A separate order in accordance with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this December 21, 2021.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE